In The United States District Court
Western District of Missouri
Central Division

DARRIN SCOTT WALKER, #512892,

    Plaintiff,

v.

MISSOURI DEPARTMENT OF CORRECTIONS,

BEECKEN PETTY O'KEEFE & COMPANY, parent company of Corizon Health,

CORIZON HEALTH, a.k.a., Corizon LLC, Corizon Medical Services,

GEORGE LOMBARDI, in his individual capacity as former Director of the Missouri Department of Corrections,

ANNE PRECYTHE, in her official and individual capacity as Director of the Department of Corrections,

DR. THOMAS PRYOR, in his official and individual capacity,

DR. UNKNOWN PROCTOR, in his individual capacity,

DR. UNKNOWN HARDMAN, in his individual capacity,

DR. UNKNOWN DAVISON, in her individual capacity,

UNKNOWN STIEFERMAN, in her individual capacity,

DR. NARENDRA KHENGARD, in his individual capacity,

DR. EARL SCOTT, in his individual capacity,

SUSAN HODGES, NP, in her individual capacity,

PAMELA SWARTZ, NP, in her individual capacity,

CYNDEE HOWELL, RN, in her individual capacity,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Verified
Complaint for Violation of Civil Rights § 1983

Case
No. _____

JURY TRIAL REQUESTED

DR. UNKNOWN T. BREDEMAN, D.O., in his
or her official and individual capacity,

UNKNOWN J. COFIELD, in his or her
official and individual capacity

CAROL COX, Nurse, in her individual capacity,

JOYCE UNKNOWN, Nurse, in her individual
capacity,

JAY CASSADY, in his individual capacity
as former Warden of JCCC,

EILEEN RAMEY, in her individual capacity
as Warden of JCCC,

JOHN OR JANE DOE(s), at Beecken Petty
O'Keefe & Co., in their official and individual
capacities,

JOHN OR JANE DOE(s), at Corizon, in
their official and individual capacities,

JOHN OR JANE DOE(s), at Missouri
Dept. of Corrections Central Office, in
their official and individual capacities,

JOHN OR JANE DOE(s), at JCCC, in
their individual capacities,

JOHN OR JANE DOE(s), at JCCC's
Corizon Medical Unit, in their individual
capacities,

            Defendants.

## Verified Civil §1983 Constitutional Rights Violation Complaint

### INTRODUCTION

**1.** The Missouri Department of Corrections, Beecken Petty O'Keefe & Co., and Corizon Health, LLC, have created and maintained a policy or custom of systematically denying necessary medical care to me and inmates diagnosed with Hepatitis C viral infections (HCV), thereby discriminating against me and us, and placing me at a serious, substantial, and unnecessary risk for severe pain, illness, injury, suffering, and death. The individual defendants have denied necessary medical care to plaintiff, who has been diagnosed with chronic HCV for 25-years, and have caused, and continue to cause me unnecessary pain, suffering, irreversible liver damage and

Case 2:19-cv-04082-NKL   Document 1   Filed 04/23/19   Page 2 of 29
Pg. 2 of 28        D. WALKER #512992

a much shorter lifespan —essentially,... a death sentence — and dire need of a liver transplant in order to live longer. (To try to live longer.)

2. Plaintiff brings this action seeking prospective, declaratory and injunctive relief pursuant to 28 U.S.C. Section 2201 and 2202 and authorized by 28 U.S.C. Section 2283 & 2284 and Fed.R.Civ.P. Rule 65, to remedy the dire ongoing deprivation of my rights guaranteed by the Eighth Amendment of the United States Constitution (as incorporated by the Fourteenth Amendment) and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. As I am in imminent danger of further irreversible liver damage and faster death. In addition, plaintiff seeks an award of damages for the harm & damage caused to me by the violation of my constitutional and statutory rights to life-saving treatment. $200-Million Dollars comp., plus $50-Million Dollars punitive.

3. Plaintiff is incarcerated in the Missouri Department of Corrections (for past 25-years) with serious health complications stemming from my chronic Hepatitis C viral infection, including stage 3 fibrosis cirrhosis and an enlarged spleen. Defendants have refused to provide the readily available direct-acting antiviral drugs (DAA) known to successfully cure the deadly disease at an approx. 96-98% success rate, that is consistent with current and prevailing medical standards. As a result, Defendants have harmed, and continue to harm, Plaintiff, under color of state law.

## JURISDICTION AND VENUE

4. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1331, and 42 U.S.C. § 1343.

5. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 (g) and L.R. 3.1 (a)(2) because substantial events at issue in this litigation occurred in the Western District of Missouri and in the County of Cole, Missouri.

## PARTIES

6. Plaintiff Darrin Scott Walker is an adult individual currently incarcerated at the Jefferson City Correctional Center, 8200 No More Victims Road, Jefferson City, MO 65101. Walker seeks injunctive and declaratory relief on behalf of my self, due to my being subject to the discriminatory and unconstitutional policy of Defendants MODOC, Beecken Petty O'Keefe & co., Corizon and individuals in their employee, for not treating me and individuals with Hepatitis C infections, as well as, damages on my individual claims.

7. Defendant No. 1 – Missouri Department of Corrections (MODOC) is a state executive agency that has the power to sue and be sued pursuant to Mo. Rev. Stat. § 217.020. MODOC is responsible for providing treatment for the serious medical needs of individuals in its custody. Central Office address: 2729 Plaza Drive, Jefferson City, MO 65102. (573) 751-2389  www.doc.mo.gov

8. Defendant No. 2 – Beecken Petty O'Keefe & Company is the corporate entity that owns Corizon, and upon information and belief, are the direct decision & policy makers directing that profit maximization supercede everything else, including and especially any expensive medical treatments, such as the DAA Hep C cures. Even at the detriment of prisoners. They are sued in their official and individual capacities. Address: 131 S. Dearborn St., Ste. 2800, Chicago, IL 60603.  www.beeckenpetty.com  (312) 435-0300

9. Defendant No. 3 – Corizon Health, a.k.a. Corizon LLC, Corizon Medical Services, is the health care provider for all MODOC facilities. Corizon LLC is a Missouri limited liability company with its principal place of business located in Brentwood, Tennessee. (Owned by Beecken Petty O'Keefe & Co.) Offices located at: 105 Westpark Dr., Ste. 200, Brentwood, TN 37027, 1-800-729-0069, www.corizonhealth.com, and 1320 Creek Trail Dr., Jefferson City, MO 65109. They are sued in their official and individual capacities.

10. Defendant No. 4 – George Lombardi was the Director of MODOC. He was responsible for the operations of MODOC, including adopting, approving, and implementing the policies applicable to the prisons that MODOC operates throughout the State of Missouri. Called Institutional Policies, Standard Operational Procedures, and Directives or Memorandums. Upon information and belief, former Director Lombardi was the final policymaker for MODOC. He is sued in his individual capacity.

11. Defendant No. 5 – Anne Precythe is the Director of MODOC. She is responsible for the operations of MODOC, including adopting, approving, and implementing the policies applicable to the prisons that MODOC operates throughout the state of Missouri. Called Institutional Policies, Standard Operational Procedures, and Directives or Memorandums. Upon information and belief, Director Precythe is the final policymaker for MODOC. She is sued in her official and individual capacities. MODOC Central Office, 2729 Plaza Dr., Jefferson City, MO 65102

12. Defendant No. 6 – Thomas Pryor was, at all times relevant to this complaint, a doctor at JCCC who was a chronic care treating physician of plaintiff Walker and exhibited deliberate indifference by failing to provide plaintiff with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his official and individual capacities.

13. Defendant No. 7 - UNKNOWN Proctor was, at all times relevant to this complaint, a doctor at JCCC who was a treating physician of Plaintiff Walker and exhibited deliberate indifference by failing to provide Plaintiff with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

14. Defendant No. 8 - UNKNOWN Hardman was, at all times relevant to this complaint, a doctor at JCCC who was a chronic care treating physician of Plaintiff Walker and who took a liver biopsy core sample from plaintiff when there was zero liver damage and exhibited deliberate indifference by failing to provide Plaintiff with any HCV treatment and failing to conduct proper testing, monitoring, and consulting.* His actions may have contributed to my liver damage. He is sued in his individual capacity.

15. Defendant No. 9 - UNKNOWN Davison was, at all times relevant to this complaint, a doctor at JCCC who was a treating physician of Plaintiff and exhibited deliberate indifference by failing to provide Plaintiff with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

16. Defendant No. 10 - UNKNOWN Stieferman was, at all times relevant to this complaint, a nurse practitioner at JCCC who was a medical treator of Plaintiff and exhibited deliberate indifference by failing to provide Plaintiff with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. She is in her individual capacity.

17. Defendant No. 11 - Narendra Khengard was, at all times relevant to this complaint, a doctor at JCCC who was a chronic care treating physician of plaintiff and exhibited deliberate indifference by failing to provide Plaintiff with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

18. Defendant No. 12 - Earl Scott was, at all times relevant to this complaint, a doctor at JCCC who was a treating physician of plaintiff and exhibited deliberate indifference by failing to provide Plaintiff with any HCV treatment, even after being made aware that plaintiff has stage 3 cirrhosis, and for failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

19. Defendant No. 13 - Susan Hodges was, at all times relevant to this complaint, a nurse practitioner at JCCC who was a chronic care medical treator of Plaintiff and exhibited deliberate indifference by failing to provide Plaintiff with any HCV treatment, even after being made aware that plaintiff has stage 3 cirrhosis, and for failing to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

20. Defendant No. 14 - Pamela Swartz was, at all times relevant to this complaint, a nurse practitioner at JCCC who was a chronic care medical treator of Plaintiff and exhibited deliberate indifference by failing to provide plaintiff with any HCV treatment, even after being made aware that plaintiff has stage 3 cirrhosis, and for failing to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

21. Defendant No. 15 - Cyndee Howell was, at all times relevant to this complaint, a registered nurse and director of nursing at JCCC who reviewed and denied the IRR portion of plaintiff's first grievance #JCCC-15-1961 related to treatment for Hepatitis C viral infection and exhibited deliberate indifference by failing to direct plaintiff's treaters to provide HCV treatment or to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

22. Defendant No. 16 - UNKNOWN T. Bredeman, D.O., was, at all times relevant to this complaint, a physician and associate regional medical director who reviewed and denied both grievances related to treatment for Hepatitis C viral infection from plaintiff and exhibited deliberate indifference by failing to direct plaintiff's treaters to provide HCV treatment, even after being made aware of plaintiff's stage 3 cirrhosis in the second grievance, and to conduct proper testing, monitoring, and consulting. He is sued in his or her official and individual capacities.

23. Defendant No. 17 - UNKNOWN J. Cofield was, at all times relevant to this complaint, director of operations of constituents services over JCCC, knew of plaintiff's chronic HCV, denied both HCV-related grievances by plaintiff and exhibited deliberate indifference by failing to direct plaintiff's treaters to provide HCV treatment, even after being made aware of plaintiff's stage 3 cirrhosis in the second grievance, and to conduct proper testing, monitoring, and consulting. She is sued in her or his official and individual capacities.

24. Defendant No. 18 - Carol Cox, Nurse, was, at all times relevant to this complaint the nurse who manages and controls the Hep C chronic care list for HCV cure treatment at JCCC for Corizon. Upon information and belief, Cox is one of the final decision makers in their so-called "cure lottery system" in who receives the HCV cure and who doesn't. By repeatedly denying plaintiff the HCV cure, Cox exhibited deliberate indifference, and by failing to direct treaters to provide HCV treatment. She further did so by failing to conduct proper testing, monitoring, and consulting, and treating it all in a "mocking, joking" deliberately indifferent manner. She is sued in her individual capacity. She knew I have stage 3 cirrhosis.

25. Defendant No. 19 - Joyce UNKNOWN, Nurse, was, at all times relevant to this complaint, the nurse who oversees, manages and controls all chronic care labwork, testing, and co-manages the cure list. Upon information and belief, Joyce is one of the final decision makers in their so-called "cure lottery system" in who receives the HCV cure and who doesn't. By repeatedly denying plaintiff

the HCV cure, even knowing that plaintiff has stage 3 cirrhosis and an enlarged spleen, Joyce exhibited deliberate indifference, as well as, by failing to direct treaters to provide HCV treatment, and failing to conduct proper testing, monitoring, and consulting. Allowing HCV to cause stage 3 cirrhosis damage, which will lead to death. She is sued in her individual capacity.

26. Defendant #20 - Jay Cassady was the warden at JCCC at times relevant to this complaint. He was responsible for the operations of JCCC, including adopting, approving, and implementing the policies for JCCC. Called Institutional Policies, standard Operational Procedures, and Directives or Memorandums. Upon information and belief, Jay Cassady was the final policy maker and decision maker for JCCC. He was suppose to review and respond to all grievances. He is sued in his individual capacity.

27. Defendant #21 - Eileen Ramey is the warden at JCCC at times relevant to this complaint. She is responsible for the operations of JCCC, including adopting, approving, and implementing the policies for JCCC. Many of which have radically reshaped JCCC. Some for the better, some for worse. Called Institutional Policies, standard Operational Procedures, and Directives or Memorandums. Upon information and belief, Eileen Ramey is the final policy maker and decision maker for JCCC. She is suppose to review and respond to all grievances. For these reasons, plaintiff sent her letters complaining about need for HCV cure treatment. She exhibited deliberate indifference by refusing to respond, refusing to direct treaters to provide HCV treatment, and by refusing to direct the conducting of proper testing, monitoring, and consulting. Even though plaintiff repeatedly informed her by Inside Mail of my stage 3 cirrhosis, an enlarged spleen and HCV-related symptoms. She is sued in her individual capacity.

28. Defendant(s) No. 22+ - John or Jane Doe(s) - Beecken Petty O'keefe & Company decision makers and policy makers who gave orders to, and set policy upon, Corizon. Directing that profit maximization supercede everything else. Even to the detriment of prisoners. By preventing prisoners with HCV from receiving the life-saving HCV DAA cures, due to costs. Upon information and belief, these defendants were the top tier policy & decision makers for Corizon. Exhibiting deliberate indifference individually and as a corporation. Knowing that it will cause many prisoners' liver damages and deaths. They are sued individually and jointly, in their official and individual capacities. Beecken Petty O'keefe & Company, 131 S. Dearborn St., Ste. 2800, Chicago, IL 60603. www.beeckenpetty.com (312) 435-0300

29. Defendant(s) No. 23+ - John or Jane Doe(s) - The decision makers and policy makers at Corizon corporate headquarters who gave orders to, and set policy upon, Corizon local offices and JCCC Corizon Medical Unit. Directing that profit maximization supercede everything else. Even to the detriment of prisoners, by preventing prisoners with HCV from receiving the life-saving HCV DAA cures, due to costs. Upon information and belief, these defendants were the second level top tier policy & decision makers between Beecken Petty O'keefe & Co. and Corizon. And, the top tier policy & decision makers at Corizon headquarters, that filter down to all of its local offices and units. These defendants exhibited deliberate

indifference, knowing that their policies and decisions will cause damages to many prisoners and deaths in their contracted medical care. They are sued individually and jointly, in their official and individual capacities. Corizon Medical Services (corporate headquarters), 105 Westpark Dr., Ste. 200, Brentwood, TN 37027. www.corizonhealth.com 1-800-729-0069.

30. Defendant(s) No. 24+ — John or Jane Doe(s) — Deputy directors who review, approve and control MoDOC Policies, including medical care. Who regularly refuse or review and answer offender complaints and grievances. Filtering them down to wardens and institutional functional unit managers (F.U.M.s) and caseworkers. Upon information and belief, these defendants remain aware of all serious problems within MoDOC, including Corizon's refusal to provide HCV DAA cures to prisoners, along with the high volume of prisoners' resulting liver damages, additional damages, and deaths. Exhibiting deliberate indifference by failing to direct medical treaters to provide plaintiff HCV treatment. They are sued in their official and individual capacities.

31. Defendant(s) No. 25+ — John or Jane Doe(s) — Deputy wardens and personnel at JCCC who review, approve and control JCCC Policies, including medical care. Including those who regularly refuse, review or answer offender complaints and grievances. Upon information and belief, these defendants remain aware of all serious problems within JCCC, including Corizon's refusal to provide HCV DAA cures to JCCC prisoners, as well as, the high volume of prisoners' resulting liver damages, additional damages, and deaths. Exhibiting deliberate indifference by failing to direct medical treaters to provide plaintiff with HCV treatment. They are sued in their **individual** capacity.

32. Defendant(s) No. 26+ — Additional healthcare providers at JCCC employed by Corizon or contracted by Corizon, especially those involved in deciding who receives the HCV DAA cure and who doesnot, in their so-called "cure lottery system". Upon information and belief, these defendants remain aware of all serious problems within JCCC's Corizon Medical Unit, as well as, the high volume of prisoners' liver damages, additional damages, and deaths due to refusing to provide HCV DAA cures to prisoners and failing to conduct proper testing, monitoring, and consulting. Exhibiting deliberate indifference and by failing to direct medical treaters to provide plaintiff with HCV DAA cure treatment. They are sued in their individual capacity. Corizon, 1320 Creek Trail Dr., Jefferson City, MO 65109. (573) 635-5315

33. At all times relevant, Defendants acted under color of state law.

## Prisoner Status

34. Plaintiff is a convicted and sentenced state prisoner in Missouri.

## Chronic Hepatitis C Virus

35. HCV is a deadly viral infection that attacks the liver, causing liver inflammation hepatitis. Spread primarily through contact with infected blood.

36. Liver inflammation caused by HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, preventing disease, and making possible essentially all metabolic processes in the body. Thus, vital for life.

37. Liver impairment can cause severe pain, abdominal and gastrointestinal problems, fatigue, "brain fog" or memory loss and confusion, weakness, and muscle wasting, difficulty or pain with urination, increased risk of heart attacks, and other serious side effects.

38. HCV can be either acute or chronic. A small percentage of people who are exposed to infected blood develop an acute infection that their body resolves without treatment. But a significant majority (75% to 85% or more) of people who develop acute HCV go on to develop the deadly chronic HCV.

39. People with chronic HCV develop fibrosis of the liver, which is a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform any of the jobs of normal liver cells, so the fibrosis reduces liver function.

40. *When scar tissue begins to take over most of the liver, this extensive fibrosis is called cirrhosis.

41. *Cirrhosis is irreversible! It can, and often does, cause additional painful complications, including widespread itching, arthritic pain throughout the body, kidney disease, jaundice, fluid retention with edema, internal bleeding, easy bruising, abdominal ascites, "brain fog" or mental confusion, lymph disorders, and even more extreme fatigue. Where an enlarged spleen is common and could rupture causing death. Along with other serious conditions.

42. In part because it can be difficult to determine exactly when significant hepatitic fibrosis becomes cirrhosis, most of these complications can occur before cirrhosis. If these complications go untreated, some can cause death.

43. Health care providers need to be aware of how drugs they prescribe chronic HCV patients can cause or exacerbate stress to the liver and need to counsel HCV patients appropriately about prescription and over-the-counter medications that affect the liver, including NSAIDS, Tylenol, etc.

44. In addition to causing day-to-day pain and other problems, chronic HCV also dramatically increases a person's risk of developing cirrhosis and liver cancer. And,... of those with chronic HCV,... at least half will develop cirrhosis and/or liver cancer, and almost everyone (70% to 95%) will develop chronic liver disease.

45.     Some 19,000 people die of HCV-caused liver disease every year in the United States. HCV is the leading indication for liver transplants in the United States.

46.     Hepatitis C virus is rampant in correctional facilities, including within the facilities of the Missouri Department of Corrections.

47.     At least 10% to 15% of the population under the supervision, care, and custody of the Missouri Department of Corrections is infected with HCV.

48.     Since more than 90% of persons who are incarcerated are eventually released into the community, most of this population will return to the general population.

✱ 49.   Each day without treatment increases a person's likelihood of developing chronic liver disease, fibrosis, cirrhosis, liver cancer, painful complications, death from liver failure, and the risk of transmitting HCV to others.

✱ 50.   For persons with cirrhosis, each day without treatment causes additional irreversible scarring and permanently reduces the function of the liver. *As with me.*

✱ 51.   As of January 2015, MDOC reported that it was treating 0.11 percent of HCV-positive inmates under its supervision, or 5 inmates out of 4,736 inmates with known HCV infections. *Now, allegedly only 5 prisoners per year, according to JCCC Corizon.*

### *Standard of Care for HCV*

52.     HCV treatment is successful when it results in a sustained virologic response (SVR) for three months following the end of treatment. SVR occurs when a person's blood has no detectable genetic material of the Hepatitis C virus. The medical community recognizes SVR as tantamount to a cure.

53.     For many years, finding and establishing an effective and safe treatment for Hepatitis C infections was a highly elusive goal. The standard treatment, which included the use

of interferon and ribavirin medications, failed to cure most patients and was associated with painful and other adverse side effects, including psychiatric and autoimmune disorders, flulike symptoms, and gastrointestinal distress. And interfered with effectiveness of DAA cures.

54. In the past four years, the Federal Drug Administration has approved new medications, called direct-acting antiviral drugs (DAA drugs), which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. 96% to 98% success rates.

55. In 2011, the FDA approved the use of protease inhibitors called boceprevir (under brand name Victrelis) and telaprevir (under brand name Incivek), and the standard of care developed into a "triple therapy" to include the combination of either boceprevir or telaprevir, plus ribavirin and interferon. The triple therapy improved results for many patients, but continued to produce painful and adverse side effects, and the treatment could take 48 weeks to complete. Manufacturing of these drugs for the United States was discontinued between 2014 and 2015 because later treatments are superior.

56. In 2013, the FDA approved DAA medications called simeprevir (under brand name Olysio) and sofosbuvir (under brand name Sovaldi). At this time, the recommended treatment was a DAA drug such as Sovaldi combined with either ribavirin or interferon, depending on the patient's other symptoms and medical diagnoses.

57. In late 2014, the FDA approved the use of Sovaldi in combination with Olysio for the treatment of Hepatitis C.

58. On October 10, 2014, the FDA approved a DAA drug called Harvoni, which is a pill that is taken once a day and combines sofosbuvir and ledipasvir.

59.     On December 19, 2014, the FDA approved a DAA drug under the brand name Viekira Pak, which combines a multi-ingredient tablet with ombitasvir, paritaprevir, and ritonavir and a tablet with dasabuvir.

60.     In July 2015 and later expanded in February 2016, the FDA approved daclatasvir (under brand name Daklinza) for use with or without ribavirin for patients with one of two variations of chronic HCV, including the most common genotype in the United States.

61.     Also in July 2015, the FDA approved a pill that combines ombitasvir, paritaprevir, and ritonavir (under brand name Technivie), for use with ribavirin, for treatment of one variation of chronic HCV for patients without cirrhosis.

62.     In January 2016, the FDA approved a pill that combines elbasvir and grazoprevir (under brand name Zepatier) for the treatment of two variations of chronic HCV, including the most common genotype in the United States.

63.     On June 28, 2016, the FDA approved Epclusa, another new DAA drug that combines sofosbuvir and velpatasvir. It is the first drug approved to treat all six major variations, or genotypes, of HCV.

64.     Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), Viekira Pak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/grazoprevir), and Epclusa (sofosbuvir/velpatasvir) have few side effects, dramatically greater efficacy, can reduce treatment duration by up to 75 percent (from 48 weeks to 12 weeks in many cases), and are administered orally rather than by injections.

65.     These eight drugs are manufactured by five different drug companies:

   a.  Sovaldi, manufactured by Gilead Sciences

b. Olysio, manufactured by Janssen Research & Development

c. Harvoni, manufactured by Gilead Sciences

d. Viekira Pak, manufactured by AbbVie

e. Daklinza, manufactured by Bristol-Myers Squibb

f. Technivie, manufactured by AbbVie

g. Zepatier, manufactured by Merck & Co., Inc.

✱ h. Epclusa, manufactured by Gilead Sciences

✱ (66.) ✱ Over 90 percent of patients treated with any of these DAA drugs are cured. ✱✱✱

✱ ✱ (67.) Because of the obvious advantages of the DAA drugs, the medical standard of

care for HCV is now well-established. The CDC encourages health care professionals to follow

the evidence-based standard of care developed by the Infectious Diseases Society of America

(IDSA) and the ✱American Association for the Study of Liver Diseases (AASLD).

✱ 68. The IDSA/AASLD guidelines are the medical standard of care. (See, exhibits - P) & Q )

69. Under the IDSA/AASLD guidelines, some groups of people should be routinely

tested for HCV, including all persons born between 1945 and 1965 and all persons who were

ever incarcerated.

70. As of January 2015, MDOC did not have a policy of routine opt-out testing for

inmates under its supervision and care.

71. When the CDC/IDSA/AASLD standard of care was updated immediately after

the first DAA drug was approved, these organizations provided "prioritization tables" and

guidance on selecting patients with the greatest need because the "infrastructure . . . did not yet

exist to treat all patients immediately."

72.     But on July 6, 2016, these organizations updated the standard of care in recognition of the fact that continuing medical research has demonstrated the safety, tolerability, and dramatic benefits of treating *all* persons with chronic HCV.

73.     The benefits demonstrated through vigorous research include: immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, improvement in necrosis and cirrhosis, reduction in portal hypertension and spleen enlargement, reduction in severe side effects including cryoglobulinemic vasculitis, a 70% reduction in the river of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic increase in quality of life.

74.     Other studies show treatment delay decreases the benefits associated with cure.

75.     Under the current prevailing standard of care, treatment with DAA drugs "is expected to benefit nearly all chronically infected persons" and the CDC, AASLD, and ISDA recommend treatment for all patients with chronic HCV infection. (See, exhibits - P & Q)

## Methods for Determining Progression of Fibrosis/Cirrhosis

76.     A person is generally diagnosed with HCV through a rapid blood test in which the blood is examined for HCV antibodies. A follow-up blood test determines whether the genetic material (RNA) of the Hepatitis C virus remains in the blood. Finally, a third blood test can determine which variation, or genotype, of HCV a person has.

77.     These diagnostic tests are different from the test(s) used to determine the progression of a person's fibrosis or cirrhosis.

78.     The severity of a person's fibrosis or cirrhosis should never be used to determine whether a person should be treated. (i.e., later stages of fibrosis/cirrhosis.)

79.    Although the standard of care is to treat <u>all</u> persons with chronic HCV with DAA drugs, it is still useful to determine the progression (staging) of fibrosis and/or cirrhosis in the liver to choose among the DAA drugs for the most appropriate treatment module for HCV, to treat other conditions or complications a person may be experiencing, and to advise patients about contraindications and drugs to avoid. (<u>See</u>, exhibits – P & Q)

80.    Health care providers use several methods to determine the advancement of a HCV-positive person's cirrhosis or fibrosis. These methods include, but are not limited to:

a.    Liver biopsy – a surgery where a provider removes a small sample of liver tissue and undertakes a histological assessment (which can contaminate the liver.)

b.    APRI (AST to Platelet Ratio Index) – using a blood sample, a ratio derived using the level of a certain enzyme in the blood, aspartate aminotransferase (AST), and comparing it to (1) usual amount of AST in the blood of a healthy person and (2) the number of platelets in the affected person's blood

c.    FIB-4 – using a blood sample, a ratio derived using the level of two enzymes in the blood, AST and alanine aminotransferase (ALT), as well as platelet count and the person's age

d.    FibroScan – a type of ultrasound known as transient elastography, which images a several-centimeter mass of liver tissue

*81.    When an APRI score is extremely high, it has good diagnostic utility in predicting severe fibrosis or cirrhosis, but <u>low and mid-range</u> scores miss many people who have significant fibrosis or cirrhosis. *As happened in my case.

82. For instance, in more than 90% of cases, an APRI score of at least 2.0 indicates that a person has cirrhosis. But more than half of people with cirrhosis will not have an APRI score of at least 2.0.

83. Where a person has been diagnosed with cirrhosis through some other means, an APRI score is irrelevant and using an APRI score to measure the progression of fibrosis is unnecessary.

84. In addition, because the levels of AST and ALT fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis.

85. Furthermore, not only do the levels of elevation of AST and ALT often fail to show the current level of fibrosis or cirrhosis, they also often fail to predict the eventual outcomes of a failure to treat the disease in a specific person.

86. Moreover, an APRI score relies only on AST and fails to take into account ALT, even though—because ALT is found predominately in the liver and not all over the body like AST—ALT is a more specific indicator of liver inflammation than AST.

87. For all these reasons, using APRI score alone to determine the severity of a person's fibrosis or cirrhosis is not adequate or appropriate.

### HCV Treatment Policy of Defendants Lombardi, MoDOC, Corizon, Precythe, and Breeken

88. Defendants MoDOC, et al., have a policy or custom of not providing DAA drug treatment to all inmates with HCV, or even all inmates with chronic HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical need for treatment.

89.     Defendants *MODOC, et. al.,*     have a policy or custom of using an APRI score—which measures the progression of fibrosis or cirrhosis—to determine whether a person should be treated, in contravention of the prevailing standard of care and in deliberate in difference to serious medical need.

✓ 90.     Defendants *MODOC, et. al.,*     have a policy or custom of not undertaking liver biopsies, FIB-4, FibroScan, or other methods of determining the stage of fibrosis or cirrhosis and relying exclusively on APRI score to determine that stage, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

✓ 91.     Defendants *MODOC, et. al.,*     have a policy or custom of failing to even consider providing treatment to HCV-positive inmates unless they have an "APRI score" above 2.0 that persists for several months, even though more than half of persons with cirrhosis will not have an APRI score at or above 2.0 and they know that AST levels are transient, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

✗ 92.     Defendants *MODOC, et. al.,*     have a policy or custom of disregarding independent diagnoses of cirrhosis or significant hepatitic fibrosis in making treatment decisions, in contravention of the prevailing standard of care and in deliberate ✗ indifference to serious medical need. ✗*As they've known of my stage 3 cirrhosis since June 2018.*

✓ 93.     Defendants *MODOC, et. als,*     have a policy or custom of basing treatment decisions on cost, rather than on need for treatment, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

94. These policies or customs have caused, and continue to cause, unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of HCV-positive inmates, as well as deaths. (Too many to list here.)

95. Contrary to the proper and necessary medical procedures and the community standard of care, Defendants MODOC, et al., have repeatedly denied requests by Plaintiff for the appropriate and medically necessary direct-acting antiviral treatment for their Hepatitis C infections.

96. Instead, Defendants MODOC, et al., classify inmates with known HCV infection as "Chronic Care Clinic Offenders." Instead of receiving treatment, these inmates receive a blood draw every six months and, at times, minimal counseling.

97. Defendants MODOC, et al., have a policy or custom of failing to require appropriate counsel of HCV-positive patients, and continuity of care across the DOC system, related to contraindications for other medications that exacerbate liver damage, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

98. Defendants MODOC, et al., have a policy or custom of permitting "Chronic Care Clinic" visits with HCV-positive inmates to be conducted by videoconference, so a visual and physical inspection of the liver cannot be undertaken, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

99. Upon information and belief, MODOC receives additional funding from the State of Missouri for inmates classified as "Chronic Care Clinic Offenders" even though the additional monitoring HCV-positive inmates receive is minimal and, in most cases, they receive no additional treatment.

Plaintiff Darrin Walker

100. I believe I may have been infected with HCV at the beginning of my prison sentence at MSP in 1995, while under the care and supervision of MODOC.

101. For many years, MODOC and CMS refused to treat my HCV.

102. For many years, MODOC and CMS, told me that the benchmark to "qualify" for the HCV treatment was to successfully complete a drug treatment program.

103. Although I finally got clean & sober in 2002, I entered into MODOC/JCCC's elite Intensive Therapeutic Community (ITC) Program in July 2009. It's a year-long bootcamp-like intensive drug treatment program. Which I successfully completed and graduated on October 26, 2010. (See, exhibit-A)

104. I remained in the ITC Program as an "elder" (graduate/role model) for a total of 7-years in ITC. Where I developed and taught neuroscience classes in biological psychology on addiction, recovery, habits and behavior. (See, exhibits-B thru-G)

105. Defendants began moving the benchmark for receiving HCV treatment on me. Steadily increasing each stage of the new elevated rules, standards or benchmark for HCV treatment. From, must have elevated ALT and AST levels, to repeated or long term elevated ALT and AST levels over many bloodtests and months. Then, changing it higher to, elevated APRI scores, to repeated or long term elevated APRI scores. Always finding or making new excuses for denying me HCV treatment, in deliberate indifference to serious medical need. Acting under color of state law.

106. The old HCV treatment using Interferon & Riboviran, upon information and belief, was being done in only 3-men's prisons: SCCC in Licking, MO; PCC in Mineral Point, MO; and FCC in Farmington, MO. In order to limit access.

107. Upon information and belief, the old HCV treatment using Interferon & Riboviran had a low success rate less than 50%. Was rumored to cause harsh negative side affects, resulted in actual death of patients, and would potentially lessen the successfulness of DAA drugs that were reported to be in the "pipeline" and trial stages. Expected to enter into MODOC and CMS service.

108. CMS doctors and nurses warned me of the dangers of Interferon & Riboviran, its low success rate, and harsh side effects. Telling me I should wait for the new HCV pill cures, which will eventually be in or at every prison.

109. I had a liver biopsy done by Defendant Hardman here at JCCC around 2007 or 2008 ??? (Approx.) which showed I was "stage 0", no fibrosis. Prompting defendants to claim that my body will probably "naturally cure itself." It may have caused damages.

110. When one doctor at JCCC finally offered me the old Interferon & Riboviran HCV treatment, the only option he offered me was transfer to South Central Correctional Center (SCCC), where I had enemies and a protection lawsuit against dangerously abusive staff. (Ref., Walker v. Bowersox, 526 F.3d 1186 (8th Cir. 2008).)

111. I had to refuse the transfer to SCCC for safety & security reasons and fears. Asking doctors if I could go to PCC, instead, or have HCV treatment medications brought to JCCC like it should have been. They refused.

112. Soon thereafter, JCCC started offering the new Harvoni brand HCV DAA cure. Which I repeatedly asked Defendants Hardman, Pryor, Proctor, Davison, Stieferman, Khengard, Swartz, Scott, Hodges, Cox, Joyce, and other John & Jane Does for. Yet, they all continually and repeatedly refused in deliberate indifference to serious medical needs. Saying it's too expensive. (see, exhibits -H)

113. I filed IRR/Grievance # JCCC-15-1961 in October 2015. Due to ongoing refusal to give me the readily available HCV DAA cure and the serious physical & chronic mental fatigue due to HCV. Which defendants denied and refused at every stage. Including grievance responders and treaters.

114. Defendants and every other treater plaintiff seen at MODOC/JCCC/Corizon or who has reviewed my HCV-related complaints, including Defendants Pryor, Proctor, Hardman, Davison, Stieferman, Khengard, Scott, Swartz, Hodges, Howell, Cox, Bredeman, Cofield, and numerous "Does", having acted with deliberate indifference to my serious medical needs and refused to treat plaintiff with the readily available DAA drugs in contravention of the prevailing standard of care.

115. I've been experiencing serious symptoms consistent with HCV symptoms. To include chronic physical & mental fatigue, "brain fog" or mental confusion, fever, along with occasional abdominal pain, dizzy spells, irregular heart rhythms, and what feels like my total body "crashing" or "failing", requiring immediate sit and rest. Making my daily life more uncomfortable and hindering my full-time employment, my only source of funds. Furthermore, I always feel like I need to urinate.

116. Around summer 2017, I had a video conference "exam" for my HCV "Chronic Care", with Defendant Thomas Pryor and in the presence of one Jane Doe nurse, here at JCCC. In which I pleaded for the newer HCV DAA cure. Defendant refused, claiming that the state of Missouri will not give Corizon the billion dollars needed to give me and everyone else in MODOC the HCV cure.

117. I asked Defendant Pryor to help me get "Medical Parole", then, so I could go get the HCV DAA cure on my own. He laughed it off as a joke. Repeatedly demonstrating Defendant Pryor's deliberate indifference to plaintiff's serious medical needs and refusing to adhere, in contravention, to the prevailing standard of care.

118. I continued to write complaint letters to MODOC and JCCC administration. Which routinely went unanswered, ignored, or filtered down for housing unit F.U.M.s and caseworkers to respond. Never any positive action or results.

119. I had a liver ultrasound on June 8th, 2018. Which showed that I have stage 3 fibrosis/cirrhosis and an enlarged spleen. (No telling what else without an MRI.) Which Defendants didn't tell me, till Friday, July 13th, 2018. Over a month later.

120. I filed another IRR/Grievance #JCCC-18-1125 on Monday, July 16th, 2018. (See, exhibits - I) which Defendants refused to answer or otherwise respond to my IRR and grievance. Choosing to ignore them in further deliberate indifference. I complained to my housing unit caseworkers and the JCCC Grievance office. I filed the next stage appeal on Monday, November 19th, 2018. Defendants Bredeman and Cofield denied and rejected my new grievance. Demonstrating their deliberate indifference, especially discovering I have Stage 3 cirrhosis, and continuing to refuse to direct plaintiff's treaters to provide HCV treatment in order to try to save or prolong my life. Refusing to treat plaintiff with the readily available DAA HCV cure drugs in contravention of the prevailing standard of care. (See, exhibit - I5)

121. I wrote to the office of CEO at Beecken Petty O'Keefe & Co. Dated November 22nd, 2018. (See, Exhibit - M) They refused to respond, demonstrating deliberate indifference to my serious medical needs and my living. Other prisoners had family call them.

122. I wrote another complaint letter to JCCC Warden, Defendant Eileen Ramey (this time keeping a copy) on December 18th, 2018. (See, Exhibit - N) Defendant Ramey refused to respond, demonstrating deliberate indifference to my serious medical needs and my living.

123. I wrote to over 110-attorneys, law firms and organizations asking for their help in getting the HCV cure, to sue for damages, and to try to help save or prolong my life. (See, Exhibit - J) *Including to the attorneys representing the Class Action, Postawko v. Missouri Dep't. of Corrections, MacArthur Justice Center at St. Louis and both A.C.L.U. branches in K.C. and St.L. I received only 29-responses, reasons why the can't or won't help me. (See, Exhibits k 1 -thru- 29)

124. Defendant Hodges was my HCV chronic care provider. Told plaintiff that JCCC Corizon now gives out five different HCV DAA cures, including Harvoni, Mavyret and Epclusa. I pleaded with Defendant Hodges to give me the HCV cure, even after finding out I have Stage 3 cirrhosis, in order to try to cure the deadly disease and to try to slow or halt the progression of the deadly cirrhosis, and try to save or prolong my life. Defendant refused to start me on a DAA HCV cure. Demonstrating deliberate indifference to my serious medical need in contravention of the prevailing standard of care.

125. I've repeatedly sought help from the attorneys representing the Class Action against defendants, but attorneys refuse to respond, take my calls or talk to me on the phone (as of this date, April 18th, 2019), or talk to me on a legal visit. My letters continue to be ignored. Not communicating in any way. Failing to adequately and properly represent me in any way. *Leaving me to die from Hep C.

126. So, plaintiff filed own Motions for relief from the court in the current Class Action, Postawko v. Missouri Dep't. of Corrections, and Motion for Appointment of Counsel, since class attorneys won't help. Judge denied my Motions. Issuing Order on 1/24/19. Document 244. (Ref.)

D. Walker

127. I wrote to the leading addiction neuroscientists at the National Institute on Drug Abuse who assisted me with developing my addiction classes for JCCC's I.T.C. Program, asking for their help. They responded as a group. (See, exhibit-O) They sent me two documents. A. "HCV Testing and Treatment in Correctional Settings"= 5-pages. (See, Exhibits-P) and, B. "Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection: Federal Bureau of Prisons Clinical Guidance: August 2018"= 37-pages. (See, Exhibits-Q) * Exhibit-P are the guidelines from the AASLD & IDSA. Which plaintiff will use in yet another new grievance for HCV DAA cure. (which they won't answer)

128. On March 3rd, 2019, I filed another new, third, IRR/Grievance on defendants for continuing to refuse me the HCV DAA cure, after Defendants did a second ultrasound on my liver and still showing Stage 3 cirrhosis and an enlarged spleen. Which defendants refuse to answer or respond to, like they did in my IRR/Grievance #JCCC-18-1125. Don't know its official JCCC-19 number, yet, since they refuse to respond. Further demonstrating their ongoing deliberate indifference and contravention of the prevailing standard of care.

129. I was scheduled to see yet another new doctor for "Chronic Care" on HCV, a doctor Nofong, on Friday, March 22nd, 2019, but he didn't show up or left early. They (JCCC Corizon) rescheduled for Thursday, April 4th, 2019 at 1pm. But, again, Nofong didn't show up, so they allegedly rescheduled. Haven't seen him yet, so I mailed him the information I was going to hand him. (See, Exhibit-R) Listing many of my HCV symptoms, such as: daily chronic fatigue, cold-like symptoms, unexplained dizzy spells & body weakness, difficulty swallowing food during meals, occasional "brain fog" or mental confusion, occasional "cramp-like" pain in liver area, etc.

130. To date, plaintiff has received no treatment for HCV. April 18th, 2019.

131. I talked to Defendant Carol Cox, the chronic care nurse who controls the list of JCCC prisoners who qualify for a HCV DAA cure. She told plaintiff that it's a "lottery-like system" in who gets picked for receiving a cure. I told Defendant Cox how I desperately need the cure and out of prison, so I can try to get a living donor liver transplant. She laughed it off, saying, "they will never give liver transplants to prisoners." I explain, "that's why I need Medical Parole or out of prison!" Demonstrating her deliberate indifference to my serious medical need and her contravention of the prevailing standard of care.

132. One day I was explaining all of this to two JCCC Corizon nurses, Amanda and Summer, when Defendant Joyce stepped out of her office, looked at my I.D., returned to her office a moment and came out with the list of prisoners allegedly "qualified" for a HCV DAA cure. Claiming that I am No. 6 on the list, but they do only five per year, due to costs, and that it would be awhile till they get to me. I told her that I need the cure now, before I die. She said there's nothing she can do. Her refusal to direct plaintiff's treaters to give me the cure, since she manages all HCV labwork and testings, and knows of my Stage 3 cirrhosis, demonstrates her deliberate indifference and contravention of the prevailing standard of care.

133. Offender Danny Kitrell, whom I work with at M.V.E., told me that he was finally started on the HCV DAA cure. Claims that Defendants Cox and Joyce told him they are allegedly doing fifteen prisoners per month now. Upon information and belief, I was suppose to be next on the list, if, ... according to what Defendant Joyce said to me about plaintiff being No. 6 on the cure list and they already picked & started treating the first five,* why was I not started on an appropriate HCV DAA cure?! Upon information and belief, this further demonstrates Corizon's broken system for properly treating chronic HCV and that their failure of their "cure lottery system" is further demonstration of defendants ongoing deliberate indifference to my serious medical needs and further contravention of the standards of care.

134. HCV primarily congregates in the liver. Giving it a Hepatitis name. It directly invades liver cells. Triggering an autoimmune response. Macrophages and kupffer cells are activated in the liver by the immune system, to release chemicals to try to destroy the virus. Causing the body's own powerful immune system to attack liver cells. Cannibalizing and destroying liver cells, mistaking them for the foreign invader virus. This powerful immune response leads to chronic liver disease that is deadly. I will die from this without the DDA cure!

135. HCV's chronic inflammation and constant immune response attack on the virus and liver, leads to gradual formation of scar tissue in the liver — a process called fibrosis, on a scale from zero-to-four. This scar tissue replaces healthy liver tissue, and as normal liver function decreases, problems arise that are severe. Leading to cirrhosis, cell death, liver cancer and host death. As has occurred to many prisoners here at JCCC and throughout MODOC. Deaths that were easily avoidable by defendants. and still are! I was not sentenced to death!

136. Without immediate court intervention to my imminent danger of ongoing and worsening liver damages, Hep C virus symptoms, cirrhosis and other damages, I will die before I can get out of prison and earn revenue streams from my business plan in order to pay for Medical care, pay for the Epclusa or Mavyret HCV DAA cure (due to HCV genotype "2b"), and pay for a needed liver transplant.

137. In emergency, I wrote to an additional 12 -attorneys/lawfirms seeking counsel. (See list at Exhibit - S) which I will try to continue to do when possible.

138. Rejection letter responses are starting to arrive. (See, Exhibits - T)

139. I, plaintiff Walker, have completed the grievance process several times. I have exhausted my administrative remedies; twice!

## CLAIMS

### COUNT I

Claim for Prospective Relief for
Deprivation of Eighth Amendment Right to Medical Care

140. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

141. Defendants' acts and omissions in failing to provide adequate medical care, and delaying care, constitute deliberate indifference to the serious medical needs of plaintiff and prisoners infected with HCV, and they thereby violate the Eighth Amendment to the United States Constitution.

WHEREFORE, Plaintiff prays this Court:

A. Issue a declaratory judgment that Defendants MODOC, Precythe, Beecken Petty O'keefe & Company, Corizon and treaters' policy of withholding treatment with DAA drugs from plaintiff and inmates diagnosed with HCV violates the Eighth and Fourteenth Amendments of the United States Constitution;

B. Enter preliminary and permanent injunctions directing that: (a) Defendants MODOC, Precythe, Beecken Petty O'keefe & Company, and Corizon formulate and implement an immediate HCV treatment policy that meets the prevailing standard of care; (b) Defendants MODOC, Precythe, Beecken Petty O'keefe & Company, Corizon and its treaters treat plaintiff immediately with appropriate DAA drugs; and (c) Defendants provide plaintiff the appropriate and accurate assessment of the true level of fibrosis and cirrhosis and other damages, through an MRI, counseling on drug-drug interactions, and ongoing medical care for complications and symptoms of HCV; and (d) any further appropriate injunctions to prevent the future deprivation of rights of plaintiff. All of which, defendants have been denying and fighting against for years. To try to save my life!

C. Award Plaintiff costs, including reasonable attorneys' fees for the appointment of counsel under 42 U.S.C. §1988 and other relevant provisions of law; and

D. Allow such other and further relief to which Plaintiff may be entitled.

## COUNT II
### Claim for Prospective Relief for Violation of the Americans with Disabilities Act
### (Plaintiff against Defendant MODOC)

142. Paragraphs 1-141 are incorporated as if fully set forth herein.

Pg. 24 of 28   D. WALKER #512442

143. Subtitle A of Title II of the Americans with Disabilities Act (ADA) prohibits public entities from discriminating against persons with disabilities in their programs, services, and activities. 42 U.S.C. §§ 12131-12134. Regulations implementing subtitle A are codified at 28 C.F.R. part 35.

144. Title II's definition of "public entity" includes any state or local government or "any department, agency... or other instrumentality" of a state or local government. 42 U.S.C. § 12131 (1)(A), (B).

145. Defendant MODOC is a "public entity" within the meaning of 42 U.S.C. § 12131 (1)(A) and 28 C.F.R. § 35.104.

146. Plaintiff has a disability within the meaning of 42 U.S.C. § 12102 (1) and 28 C.F.R. § 35.104.

147. Plaintiff is "a qualified individual with a disability" within the meaning of 42 U.S.C. § 12131 (2) and 28 C.F.R. § 35.104 because I meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by MODOC other than the fact that they require reasonable modifications to rules, policies, or practices, the removal of barriers, or the provision of auxiliary aids and services.

148. MODOC subjects plaintiff to discrimination by withholding medically appropriate treatment that will likely cure my disability, although MODOC does not often withhold lifesaving treatments from individuals with different disabilities. (i.e., cancer) This denial of treatment and discrimination violates 42 U.S.C. § 12132 (and the regulation promulgated under it — 28 C.F.R. Part 35) which states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

149. As a result of Defendant MODOC's violations of the ADA and its implementing regulations, Defendant MODOC is liable to Plaintiffs for injunctive and declaratory relief pursuant to 42 U.S.C. § 12133.

WHEREFORE, plaintiff prays this Court:
  A. Issue a declaratory judgment that Defendant MODOC's policy of withholding treatment with DAA drugs from plaintiff and inmates diagnosed with HCV violates the Americans with Disabilities Act;
  B. Enter preliminary and permanent injunctions directing that: (a) Defendant MODOC formulate and implement an HCV treatment policy that meets the prevailing standard of care, including identifying persons with HCV; (b)

Pg. 25 of 28        D. WALKER  512412

Defendant MODOC treat... me, the plaintiff, with appropriate DAA drugs; and (c) Defendant MODOC provide plaintiff an appropriate and accurate assessment of the true level of fibrosis, cirrhosis and other damage, through an MRI, counselling on drug-drug interactions, and ongoing medical care for complications and symptoms of HCV; and (d) any further appropriate injunctions to prevent the future deprivation of rights of plaintiff.

C. Award Plaintiff's costs, including reasonable attorneys' fees under 29 U.S.C. § 794a and other relevant provisions of law; and

D. Allow such other and further relief to which plaintiff may be entitled.

## COUNT III
### Claim for damages for Deprivation of Eighth Amendment Right to Medical Care
(Against each defendant)

150. Paragraphs 1-141 and 142-149 are incorporated as if fully set forth herein.

151. The acts and omissions of Defendants, Et. al., in failing to provide adequate medical care, and delaying care, to plaintiff constitutes deliberate indifference to the serious medical needs of prisoners and plaintiff infected with HCV, and they thereby violate the Eighth Amendment to the United States Constitution.

152. At all times relevant, plaintiff Walker had a serious medical need for treatment of my HCV with DAA drugs. Cures! Drugs with a high success rate.

153. At all times relevant, Defendants were aware of plaintiff Walker's serious need for medical care.

154. At all times relevant, Defendants acted with deliberate indifference, failed to provide the medical care, or failed to direct that the medical care be provided. They could and should have intervened at any time.

155. As a direct result of the failure of Defendants to provide care or direct that care be given, plaintiff Walker was harmed and still being harmed.

156. In addition, in their actions described herein, Defendants acted pursuant to and in accordance with the policy and custom of Defendants MODOC, Lombardi, Precythe, Beecken Petty O'keefe & Company, and Corizon, to withhold treatment with DAA drugs cures from plaintiff and persons diagnosed with HCV.

WHEREFORE Plaintiff Walker prays this Court:

A. Award him/me compensatory damages; 200-Million Dollars or whatever a Jury Deems 1 human life is worth.

B. Award plaintiff punitive damages; $50-Million Dollars;

C. Award his costs, including reasonable attorneys' fees for counsel under 42 U.S.C. § 1988 and other relevant provisions of law; and

D. Allow such other and further relief to which I may be entitled.

## COUNT IV
### Claim for Damages for Violation of Americans with Disabilities Act (Against each Defendant)

157. Paragraphs 1—156 are incorporated as if fully set forth herein.

WHEREFORE Plaintiff Walker prays this Court:

A. Award him compensatory damages; $200-Million Dollars;

B. Award him punitive damages; $50-Million Dollars;

C. Award Plaintiff's costs, including reasonable attorneys' fees under 29 U.S.C. § 794a and other relevant provisions of law; and

D. Allow such other and further relief to which he may be entitled.

## Previous Lawsuits

158. Plaintiff has not had a case dismissed based on "three strikes rule".

159. Plaintiff has filed only one other lawsuit. Darrin Scott Walker v. Michael Bowersox, et.al., 526 F.3d 1186 (8th Cir. 2008). Which was lost at jury trial due to poor prosecution by plaintiff attorneys and plaintiff's forgetting a key document. 05-3001-CV-S-RED-P-APP.

## Brief Memorandum of Law in Support

160. Defendants have allowed several prisoners to die, due to their denial of HCV DAA Drugs, upon information and belief, (e.g., Eric Meyers, Steve Jimerson, etc.), and I do not want to be one of the next ones they let die! Estelle v. Gamble, 429 U.S. 97, 103 (1976); Brown v. Plata, 131 S.Ct. 1910, 1928 (2011); Postawko v. MO. Dept. of Corr., 2017 U.S. Dist. Lexis 71715.

161. Plaintiff has and will continue to suffer more without an injuction. Lambert v. Buss, 498 F.3d 446, 452-53 (7th Cir. 2007).

162. It is in the public interest. Phelps-Roper v. Nixen, 545 F.3d 685, 690 (8th Cir. 2008); Llewelyn v. Oakland County Prosecutor's office, 402 F.Supp. 1379, 1393 (E.D. Mich. 1975) - "The Constitution is the ultimate expression of the public interest."

163. Imminent danger requires immediate court action and intervention. Ibrahim v. Dist. of Columbia, 463 F.3d 3, 6-7 (D.C. Cir. 2006); Brown v. Johnson, 387 F.3d 1344, 1350 (11th Cir. 2004); Armstrong v. Drahos, 2002 WL 187502, 1 (N.D. Ill. Feb. 6, 2002).

# Certification and Closing

Under Federal Rule of Civil Procedure 11, I certify to the best of my knowledge, information, and belief that this complaint :(1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the clerk's office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the clerk's office may result in the dismissal of my case.

Date: April 18th, 2019

Respectfully Submitted,

DARRIN Scott WALKER
#512992
Jefferson City Correctional Center (3D-208)
8200 No More Victims Road
Jefferson City, MO 65101-4539

# VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct. Hereby so verified.

Executed at Jefferson City, Missouri on April 22, 2019

X _____

DARRIN Scott WALKER #512992
Jefferson City Correctional Center (3D-208)
8200 No More Victims Road
Jefferson City, MO 65101-4539

State of Missouri
County of Callaway

Subscribed and sworn before me this 22nd day of April in the year 2019.

_____
Matthew Todd

NOTARY PUBLIC
NOTARY SEAL
STATE OF MISSOURI

MATTHEW TODD
My Commission Expires
June 4, 2022
Callaway County
Commission #18297265

In The United States District Court
Western District of Missouri
Central Division

DARRIN Scott WALKER,
           Plaintiff,

    V.

Missouri Department of
Corrections, et. al.,
           Defendants

Civil Action No. _____

## Certificate of Service

I, Darrin Scott Walker, the plaintiff, file complaint, Motions and exhibits by the court's e-filing system on April, 23, 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Jefferson City, Missouri on April, 23, 2019.

Date: April, 23, 2019

DARRIN S. WALKER #51299Z
Jefferson City Correctional Center (3D-208)
8200 No More Victims Road
Jefferson City, MO 65101-4539